CARLA NOTAH

Plaintiff

vs.

LOUIS NOTAH

Defendant

Opinion of the Window Rock District Court

Decided on October 4, 1979

BROWN, District Judge

I.

A Motion for Change of Child Custody was filed with the District Court on February 7, 1978. Louis Notah sought custody of his two-and-a-half year old daughter Michelle, whose custody had originally been granted to her mother by a decree of divorce issued September 29, 1976. A hearing was held on May 1, 1978, and temporary custody pending a full investigation was granted to Mr. Notah on May 10, 1978. On June 28th an Order was issued to Bi-State Social Services requesting a social investigation and report and setting the hearing for 10:00 A.M., July 5, 1978.

The report was filed on July 7, 1978, and contained a request that more time be given in which to submit a recommendation. In the meantime, a hearing was held on September 28, 1978, and joint custody of Michelle was granted to both her mother and father by order

of the Court dated October 3, 1978. The order stated: "The District Court will await final report and recommendation from the Social Service Branch and/or BIA Welfare Branch as to final custody of minor child involved MICHELLE NOTAH, DOB: 08-15-75."

On April 17, 1979, the Court ordered BIA Social Services to make an investigation pursuant to 9 N.T.C. 609 and to report at 10:00 A.M. on July 11, 1979. On July 5th, the BIA responded by requesting by letter a postponement of the hearing because the investigation had not been done due to difficulty in contacting the parties to the action. At the hearing, which was held as scheduled, the advocates for both parties to the action moved the Court to hold both the Bi-State Social Services employees and the BIA Social Services employees in contempt of court for failure to comply with the orders of investigation. Orders to Show Cause were issued and the hearing set for August 3, 1979. At the hearing Bi-State submitted a report with a recommendation, but BIA Social Services did not. By order of this Court dated August 9, 1979, Albert Long and Ella Shirley of Bi-State Social Services were reprimanded for the delay in submitting a recommendation and Betty Authur and Wilbur Livingston of BIA Social Services were adjudged in contempt of court and ordered to pay a fine of $50.00

No further action was taken before the Court and the fine was not paid. The Court did receive an ex-parte communication from Donald Dodge, Area Director, stating that it was the BIA's position that Social Services cooperates with the Tribal Courts on a voluntary basis,

and requesting a reconsideration of the contempt order.

II.

There are two issues before the Court:

1. Should an ex-parte communication which calls attention to a conflict between Federal law and Tribal law be considered by a Tribal Court as relevant to the matter before it; and

2. Should the contempt order issued in this matter be withdrawn?

For the reasons stated below, I answer both of these questions in the affirmative.

III.

The term "ex-parte" has two meanings. Generally, it is used to refer to the situation in which one party to a proceeding makes application to the Court to hear his side without notice to the other party or an opportunity for the other party to respond before the Court renders a decision. Because the inherent unfairness in hearing only one side before a decision is made is obvious, it is basic to the legal system that such applications to the Court are allowed only in narrow and extreme circumstances. An example would be an application for a restraining order made by a party who alleges and proves to the Court's satisfaction that unless the other party is restrained at once irreparable injury will occur. Even then, the restraining order is only temporary until a hearing can be held at which both parties are pre-

sent.

But "ex-parte" also means a situation in which an individual who is not a party to the proceeding has an interest in the matter which entitles him to make application to the Court. I believe the second situation applies to Mr. Dodge. His interest was in the clarification of the BIA's position with regard to subpoenas issued by the Tribal Courts and in attempting to resolve a conflict between Federal law and Tribal law. It was because of his instructions to his employees that they were in danger of arrest for failure to obey a Court order holding them in contempt.

Therefore, I hold that it is proper for this Court to consider Mr. Dodge's letter regarding this matter. It would have been better for Mr. Dodge to have made a formal motion before the Court and to file the motion with the clerk of the Court as part of this action, and in no way do I mean for this opinion to be interpreted as license for anyone who is concerned with a matter before the Court to communicate with the Court by means of a letter instead of a formal motion. I only hold, very narrowly, that for this particular matter in this particular instance and for this time only, the Court will consider the issues raised in Mr. Dodge's letter because they are important considerations for this case as well as any other case in which BIA employees may be called upon to testify before the Courts of the Navajo Nation.

IV.

The issues raised by Mr. Dodge's letter point out the dilemma in which the Courts of the Navajo Nation are placed. It is the contention of the BIA that federal employees cooperate with the Tribal Courts only voluntarily and that the Courts have no power to subpoena a federal employee or to hold that employee in contempt of court for any failure to appear or to testify. Mr. Dodge's letter states: "Whether or not Federal employees testify and present documentary evidence in tribal court is wholly a matter within the realm of Federal, rather than tribal law."

Yet, the Tribal Courts are bound by Tribal law. Title 7, Section 206(b) states:

> (b) Employees of the Bureau of Indian Affairs, particularly those who are engaged in social service, health and educational work, shall assist the court, upon its request, in the preparation and presentation of the facts in the case and in the proper treatment of individual offenders.

This section of the Code was passed by Tribal Council Resolution CJA-1-59 and was approved by the Secretary of the Interior on February 11, 1959. The language is contained, verbatim, in 25 Code of Federal Regulations Section 11.21. It is, therefore, the opinion of this Court that the Federal government mandates (by the use of the word "shall") that the BIA Social Services do the social investigations for the Tribal Courts when requested to do so.

It is also the opinion of this Court that the Tribal Council

-111-

interprets the above section in the same way. Otherwise, they would not have required the Courts to request the Agency Branch of Welfare for an investigation in every adoption case. See Title 9, Section 609 which reads:

§ 609.   Investigation

(a)  Upon filing of a petition for adoption the court shall request the Agency Branch of Welfare, with the technical assistance of the state and other government branches of welfare, to make an investigation. Such investigation shall include the history of the child; appropriate inquiry to determine whether the proposed home is a suitable one for the child; and any other circumstances and conditions which may have a bearing on the adoption or custody and of which the court should have knowledge.

(b)  The report of the investigation shall be a part of the file in the case and shall contain a definite recommendation for or against the proposed adoption stating the reasons therefor.

It was passed by Tribal Council Resolution CN-63-60. In the past, the Navajo Court of Appeals has held that a decree of adoption granted without a BIA Social Services investigation is null and void. In Re Adoption of Tsosie, 1 Nav.R. 112 (1977).

The conflict, thus, becomes clear. In order to avoid a confrontation in federal court to decide this issue, this Court now holds that Title 7, Section 206(b) is directory, not mandatory, and that Title 9, Section 609 does not restrict the Navajo Tribal Courts to the use of BIA Social Services as the only agency from whom a social investigation report and recommendation may be obtained,

This holding is further stregthened by Title 9, Section 1171

of the Tribal Code. 9 N.T.C. 1171 requires that a social investigation be made in all cases wherein the Court has jurisdiction by virtue of 9 N.T.C. 1053 but does not specify by whom. These are most juvenile case situations where the juvenile has been brought to the attention of the Court because he is in some kind of trouble. These two sections read:

### § 1171. Social investigation-Generally

Whenever practicable the court shall require that a social investigation be made and a report be submitted to the court in writing in all cases under 9 N.T.C. § 1053 in which a petition has been filed.

### § 1053. Jurisdiction of court

Except as otherwise provided by Navajo Tribal Council, the Juvenile Courts shall have original jurisdiction of all persons within the territorial jurisdiction of the Tribe:
(1) Concerning any child who is alleged to have violated any Federal, Tribal, state, or local law or municipal ordinance, regardless of where the violation occurred.
(2) Concerning any child:
  (A) who is neglected or dependent child, as defined in 9 N.T.C. § 1002; or
  (B) who is beyond control of his parent, custodian, or school authorities.
(3) To determine the custody of any child or appoint a guardian of the person of any child who comes within the purview of the court's jurisdiction under other provisions of this chapter.
(4) To determine the legal parent-child relationship, including termination of residual parental rights and duties, as to a child who comes within the purview of the court's jurisdiction under other provisions of this chapter.
(5) For judicial consent to the marriage, employment or enlistment of a child in the armed forces, and to emergency medical or surgical treatment of a child who comes within the purview of the court's jurisdiction under other provisions of this chapter.

(6) For the treatment or committment of a mentally defective or mentally ill child who comes within the purview of the court's jurisdiction under other provisions of this chapter.

This Court now finds that Title 9, Section 1053(4) includes adoption proceedings. Therefore, the social investigation required by 9 N.T.C. 1171 applies to adoption proceedings and no particular social agency is specified to conduct that investigation.

In light of the above analysis, it is not mandatory that BIA Social Services be the only vehicle in which the Courts of the Navajo Nation receive social investigation information in juvenile cases. Absent federal litigation, the issue of the Navajo Court's subpoena and contempt power over federal employees cannot be decided. At this point, it is the Court's belief that to wait for federal disposition of this issue would only bring further harm to the little girl whose custody has been in question for over a year and a half. To avoid federal litigation, the Order of this Court issued August 9, 1979, is hereby VACATED.

IT IS SO ORDERED.